UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KATHLEEN TELMONT,

        Plaintiff,

                                            Case Number 07-14264-BC

v.                                          Honorable Thomas L. Ludington

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

        Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DISMISSING WITH PREJUDICE
COUNT II OF PLAINTIFF'S AMENDED COMPLAINT**

Defendant Unum Life Insurance Company of America's ("Defendant") motion for judgment on the pleadings [Dkt. # 14] is presently before the Court. Plaintiff Kathleen Telmont's ("Plaintiff") complaint alleges a claim for intentional infliction of emotional distress ("IIED") arising from contact between Plaintiff and Defendant concerning her brother's life insurance proceeds. On February 12, 2008, the Court granted Defendant's motion to dismiss Plaintiff's IIED claim on the basis that the preemption clause of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144, preempts state causes "relating to" an ERISA governed life insurance claim.

The Court acknowledged, however, Plaintiff may be able to allege a cause of action for IIED that is not preempted by section 1144 and granted Plaintiff leave to amend her complaint. On February 29, 2008, Plaintiff filed an amended complaint alleging her IIED claim in further detail. Defendant filed the instant motion for judgment on the pleadings. Defendant asserts it is entitled

to judgment because Plaintiff's IIED claim does not allege sufficiently extreme and outrageous behavior to sustain an IIED claim under Michigan law. Alternatively, Plaintiff's IIED claim is preempted by section 1144.

The Court will **GRANT** Defendant's motion because Plaintiff's complaint does not allege sufficiently extreme and outrageous conduct. In light of that conclusion, the Court will not address Defendant's preemption argument.

Although Defendant's motion was scheduled for hearing before this Court on May 20, 2008, the Court has reviewed the parties' submissions and concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2).

I

As introduced above, the Court previously considered Plaintiff's IIED claim in a previous order granting Defendant's motion to dismiss. The Court relied on the following factual summary:

> According to Plaintiff's complaint, her brother, Michael Telmont ("Decedent"), passed away in California on August 1, 2005. The Decedent's employer, Payroll Solutions, provided him with $100,000.00 of life insurance coverage through Defendant. Plaintiff was the beneficiary of that policy. Defendant believed that Plaintiff was only entitled to payments totaling $80,000.00, however, Plaintiff maintained that Defendant had not satisfied the entire amount owed under the policy. Defendant rejected Plaintiff's repeated demands for an additional $20,000.00 payment.
>
> According to Defendant's counsel, the plan provided payment of $100,000.00 or five times the policy holder's salary from the previous year, which ever was the lesser amount. Allegedly, the Decedent earned approximately $16,000 during his previous year of employment. As a result, Defendant determined that the beneficiary of the plan, Plaintiff, was entitled to $80,000.00, instead of the maximum amount allowed under the plan, $100,000.00.

Count II of Plaintiff's complaint[1] alleges that Defendant's conduct with respect to the investigation and processing of the Decedent's policy is grounds for an intentional infliction of emotional distress ("IIED") claim. Though the complaint does not explain the outrageous conduct in great detail, Plaintiff alleges that Defendant intentionally contacted Plaintiff after Plaintiff's counsel informed Defendant that she was represented. Plaintiff's Count II consists of the following two paragraphs:

> 7. The attorney for Plaintiff, Steven L. Snyder, notified Defendant on three separate occasions by letter to not contact Ms. Telmont directly and to only contact him due to Plaintiff's impaired mental state due to the death of her brother. Further Plaintiff suffers from life threatening illnesses which are aggravated by stress.
>
> 8. Despite these pleas, Defendnat (sic) continued to directly contact Ms. Telmont deliberately inflicting mental distress upon her resulting in post traumatic stress disorder which will require medical treatment for many years. Due to these contacts, Plaintiff's life threatening illnesses have been exacerbated resulting in enormous medical expenses plus needless pain and suffering.

Dkt. # 1 at 8. According to Plaintiff's response brief, Plaintiff's counsel notified Defendant in three letters that Defendant was only to contact counsel regarding the disputed policy. After the second contact, Plaintiff's counsel letter provided as follows:

> . . . I instructed Payroll Solutions and Unum Insurance that they were to have no contact with my client. This instruction has been repeatedly ignored and I am not happy over it. [Plaintiff] has a severe physical disability as well as serious emotional problems dealing with the untimely death of her brother. Your continued contact aggravates these conditions. DO NOT CONTACT MY CLIENT AGAIN ONLY CONTACT ME. If you persist in this conduct, I will file claims [sic] for intentional infliction of emotional distress.

Dkt. # 15 at 5. Allegedly, Defendant again contacted Plaintiff after counsel sent this letter.

At the hearing, Defendant's counsel acknowledged that Defendant contacted Plaintiff approximately six times despite Plaintiff's counsel's requests to cease. Defendant's counsel maintained that the contacts were the result of a lack of communication

---

[1] Plaintiff's complaint does not clearly allege a "Count I." Defendant's brief, however, acknowledges that "Count I" seeks to recoup the disputed $20,000.00 and Count II seeks compensatory damages for IIED.

between Defendant's various divisions. Defendant's counsel acknowledged that Defendant undertook a limited investigation with respect to the Decedent's policy, including contacting Plaintiff. Furthermore, Defendant's counsel indicated that the division responsible for the claim ceased direct communications with Plaintiff after receiving the request.

Defendant's counsel explained during the hearing that Plaintiff's policy included a "personalized financial counseling" service intended to provide assistance to the beneficiary with obligations arising from the policy generated payment, e.g. taxes, investments, effect on other benefits, etc. Defendant's counsel asserted that the department responsible for the counseling service was unaware of the requests and continued to contact Plaintiff in order to provide financial assistance.

At the hearing, Plaintiff's counsel did not indicate the substance of the Defendant's communications with Plaintiff that caused her injury, merely maintaining that Defendant's communications harassed Plaintiff. Nor did he indicate whether the financial counseling division or the claim division contacted Plaintiff.

In September of 2007, Plaintiff initiated this action in Saginaw County Circuit Court. Defendant removed the action to this Court and filed the instant motion to dismiss.

Dkt. # 24.

On February 29, 2008, Plaintiff amended her complaint re-asserting a cause of action for IIED. Dkt. # 27. The amended complaint alleges that Defendant "willfully and intentionally inflicted mental distress" by contacting Plaintiff via telephone or mail approximately fourteen times between March 20, 2006 and December 4, 2006. *Id.* at ¶ 5. Plaintiff asserts that Defendant had "direct knowledge that these contacts were harming [] Plaintiff both mentally and physically and having been instructed repeatedly not to contact Plaintiff but to only contact her attorney. *Id.*

Plaintiff's amended complaint supplemented her allegations with the facts discussed below. On December 12, 2005, Plaintiff's counsel notified Defendant's agent, Payroll Solutions, that all inquiries should be directed to counsel. *Id.* at ¶ 5(a); Dkt. # 27-3. This letter was sent to a claims consultant in North Las Vegas, Nevada. *Id.* On March 15, 2006, counsel sent another letter to Payroll Solutions and Defendant that again indicated that "[a]ny further correspondence or inquiries

regarding [Plaintiff's benefits] should be addressed to [counsel]." *Id.* at ¶ 5(b); Dkt. # 27-4. This letter was again sent to Defendant in North Las Vegas, Nevada, and to Defendant at a Portland, Maine address. *Id.* On March 20, 2006, Defendant's employee, Todd Seehagen ("Seehagen"), sent a letter to Plaintiff notifying her of "survivor support" service, which was incorporated into the life insurance benefit. Dkt. # 27-5. The letter indicates that it was from Defendant's office in Columbia, South Carolina. *Id.* On March 21, 2006, Defendant's employee, Alexandra Allen ("Allen"), sent an additional letter offering "survivor support" services from Columbia, South Carolina. Dkt. # 27-6.

On March 28, 2006 Defendant, apparently through its agent, Sandy Menzer ("Menzer") of the Ayco Company, contacted Plaintiff regarding "survivor support" services. Dkt. # 27-7. The letter indicated that Defendant had telephoned Plaintiff and described the conversation as follows:

> [Plaintiff], I appreciated the opportunity to speak with you and have enclosed information explaining a little more about the service. I hope your (sic) are feeling better since your surgery. Please contact me directly . . . when you are ready to be scheduled, or if I can be of further assistance. We have appointments available for a counselor to call you days, evenings and Saturdays. I look forward to hearing from you!

*Id.* On May 8, 2006, Menzer sent a similar letter, again indicating that Defendant telephoned Plaintiff. Dkt. # 27-8. It stated in pertinent part as follows:

> [Plaintiff], our counselor . . . tried to contact you Friday, 5/5 while I was out of the office, but we caught you at a busy time. When you are ready to schedule an appointment, please contact me directly . . . I hope you are feeling better soon.

*Id.* On May 23, 2006, Sonja L. Hanselman ("Hanselman") of the Ayco Company sent a letter thanking Plaintiff for "a very productive meeting." Dkt. # 27-9.

On May 30, 2006, Plaintiff's counsel sent a letter to Seehagen instructing Defendant not to contact Plaintiff directly. Dkt. # 27-10; *see supra* at 4. It appears that Plaintiff's counsel also

forwarded a copy to Menzer. *Id.* Thereafter, on May 25, 2006, Defendant sent a form letter explaining the plan's proceeds had been deposited into a security account. Dkt. # 27-11. On June 5, 2006, Defendant sent an account statement showing the closing of her security account. Dkt. # 27-12. On October 26, 2006, Defendant's benefits specialist, Tracy McKenzie ("McKenzie"), requested in a letter that Plaintiff complete an affidavit in order to obtain the release of the Decedent's pharmaceutical records. Dkt. # 27-13.

On November 3, 2006, Plaintiff's counsel sent a letter to McKenzie. It stated as follows:

In a letter dated May 30, 2006, I informed Unum Insurance Company to have no contact of any nature with my client, [Plaintiff], regarding any matter concerning the death of her brother, [the Decedent] . . . This was a follow-up of my letter dated March 30, 2006, in which I instructed your company to have no contact with my client and that all communication was to made to me. I informed your company that my client has sever (sic) physical disability as well as serious emotional problems dealing with the untimely death of her brother. Despite these admonitions, you directly contacted my client once again on October 26, 2006 subjecting her once again to severe emotional distress. This contact can only be explained that: 1) you do not understand English or 2) you are deliberately inflicting severe emotional distress on my client so that she will cease to cooperate and you will have some basis to deny an otherwise completely valid claim. In short, your conduct and that of your company is despicable. I am returning your requested release so you can forget about denying the claim due to noncooperation. You have 30 days to pay the claim before I sue you for the claim and intentional infliction of mental distress. In the mean time (sic) I am sending a copy of this correspondence to the Commissioner of Insurance as I believe regulatory action is warranted against your company.

Dkt. # 27-14. Despite this letter, McKenzie sent a letter updating the status of Plaintiff's claim. Dkt. # 27-15. McKenzie's letter also indicated that she forwarded a copy to Plaintiff's counsel, as well. *Id.* In total, Defendant contacted Plaintiff by letter at least nine times. Plaintiff also alleges that Defendant's agent(s) telephoned Plaintiff five times. Dkt. # 27 at ¶ 5(e), 5(g), 5(h), 5(I), and 5(k).

Plaintiff contends that these communications caused post-traumatic stress disorder. Dkt. #

-6-

27. The allegations in Plaintiff's complaint do not describe the nature or substance of the communications. Instead, Plaintiff attached the letters to the complaint.

II

"A Rule 12(c) motion for judgment on the pleadings for failure to state a claim upon which relief can be granted is nearly identical to that employed under a Rule 12(b)(6) motion to dismiss." *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006) (citations omitted). A court "must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (citation and internal quotations omitted). Legal conclusions or unwarranted inferences need not be accepted as true. *Id.* (citation omitted).

III

Defendant contends that Plaintiff's allegations, taken as true, do not allege sufficiently extreme or outrageous conduct to state a cause of action for IIED. Though the Michigan Supreme Court has not officially recognized IIED as a tort under Michigan law, the Michigan Court of Appeals has done so. *See Heckman v. Detroit Chief of Police*, 705 N.W.2d 689, 700 (Mich. Ct. App. 2005) (*citing Nelson v. Ho*, 564 N.W.2d 482, 487 n.6 (Mich. Ct. App. 1997) (*citing Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905 (Mich. 1985))). To establish a prima facie claim for IIED, a plaintiff must demonstrate the following four elements: (1) extreme and outrageous conduct, (2) intentional or reckless conduct, (3) causation, and (4) severe emotional distress. *Id.*

The meaning and scope of extreme and outrageous conduct is the sole issue germane to Defendant's first argument. The Michigan Court of Appeals described extreme and outrageous conduct as acts that "go beyond all possible bounds of decency . . . and utterly intolerable in a

civilized society." *Grochowalski v. Detroit Auto. Inter-Insurance Exchange*, 430 N.W.2d 822, 826 (Mich. Ct. App. 1988) (comments by the defendant insurer that the plaintiff should amputate her leg due to injuries sustained in an automobile accident were not outrageous as a matter of law). The reasoning in *Grochowalski* mirrors that provided in the Second Restatement of Torts. *See* Restatement (Second) of Torts § 46 cmt. d. (1965). The commentary of the Restatement indicates mere intentional tortious or criminal conduct is insufficient to meet the outrageous standard, absent atrocious conduct. *Id.* It recognizes, however, that when a special relationship exists between the parties there "may be recovery for insults not amounting to extreme outrage." *Id.* (referring to liability for offensive conduct by a common carrier or other public utility); *see also* Restatement (Second) of Torts § 48 (1965).

Plaintiff asserts in her response that Defendant was aware that Plaintiff was particularly susceptible to harassment and Defendant abused that weakness to affect Plaintiff's interest. Dkt. # 32 at 5. Plaintiff relies on *Margita v. Diamond Mortg. Corp.*, 406 N.W.2d 268, 272 (Mich. Ct. App. 1987), which acknowledged that the context of the parties' relationship bears on the characterization of the conduct as outrageous. The court discussed the importance of the parties' relationship as follows:

> The extreme and outrageous character of the conduct may arise from the position of the actor or a relationship to the distressed party. For example, it may occur through an abuse of a relationship which puts the defendant in a position of actual or apparent authority over a plaintiff or gives a defendant power to affect a plaintiff's interest. Whether a defendant's acts were sufficiently outrageous depends upon the context in which the defendant committed them.

*Id.* (citations omitted). Ultimately, the *Margita* court concluded that telephone calls and letters made by a lender to a debtor threatening the assessment of "imagined" late fees and the initiation of erroneous foreclosure proceedings over a two-year period "may be viewed as extreme and

outrageous conduct." *Id.*

Plaintiff also relies on *Atkinson v. Farley*, 431 N.W.2d 95 (Mich. Ct. App. 1988), for the proposition that "deliberately bypassing" counsel in order to harass a plaintiff may be deemed to be outrageous conduct. Dkt. # 32 at 6. In *Atkinson*, the plaintiff alleged the following:

> [T]hat defendants had engaged in a deliberate pattern of harassment by unilaterally reducing his [worker's compensation] benefit to an inadequate amount, by communicating to plaintiff directly rather than through his counsel, by taking advantage of plaintiff's limited education by citing legal authority purportedly allowing defendants to reduce plaintiff's benefits and demand reimbursement, and by ordering plaintiff to reimburse to defendants a huge sum which defendants knew they were not owed.

*Id.* at 96. The court concluded that the plaintiff stated a cause of action for IIED by alleging that the defendant "abus[ed] their control of plaintiff's income in order to harass and intimidate him to gain economic benefit . . . " *Id.* at 98. Those abuses included interfering with the plaintiff's benefits, demanding repayment of a large sum of money, threatening to terminate the plaintiff's benefits, as well as contacting the plaintiff despite plaintiff's request to only contact counsel. *Id.*

Plaintiff acknowledges, and Defendant highlights, that the direct communication with the client in *Atkinson*, rather than counsel, served as only part of the reason the court found that the conduct could be considered outrageous. Plaintiff focuses on the fact that Defendant contacted Plaintiff after counsel informed Defendant to contact him. Though Defendant's conduct was certainly negligent, and perhaps intentional, the substance of the communications were relatively benign and do not rise to the level of extreme or outrageous. First, the communications mainly revolved around "survivor support" services, which are intended to aid a beneficiary with potential tax and other financial problems associated with receiving a lump sum of money. The service was an included benefit of the plan that did not address the legitimacy of Plaintiff's claim, merely

provided aid. Moreover, other communications were as formulaic as account statements. The only communication that even began to approach an adversarial or harassing tone was the October 26, 2006, letter requesting Plaintiff complete an affidavit in order to obtain the release of the Decedent's pharmaceutical records. Dkt. # 27-13. Beyond that letter, there is no indication from the exhibits, or the allegations contained in Plaintiff's complaint, that Defendant made any harassing or manipulative statements that would be considered extreme or outrageous. Thus, there does not appear to be any allegation that Defendant communicated with Plaintiff for the purpose of abusing its relationship with her or gaining an advantage while processing her claim.

In fact, Plaintiff's allegations rely on the notion that numerous communications with Plaintiff, despite four requests to contact counsel, equates to extreme and outrageous conduct. The allegations, taken as true, indicate that Plaintiff's counsel informed Defendant on four occasions that it should contact Plaintiff. These requests notwithstanding, the mere number of communications is not, in and of itself, extreme and outrageous as a matter of law. First, the communications were initiated by at least four different people from different departments or agents located throughout the country. Though Defendant should have had procedures in place to respect counsel's requests, the subject of the communications addressed issues that were primarily unrelated to the resolution of the claim (e.g. survivor support services). Second, Plaintiff has not offered any authority that the number of contacts, absent other extenuating circumstances, could be considered extreme and outrageous conduct.

Ultimately, Plaintiff asserts that her injuries are as a result of numerous communications causing her mental distress due to her "unique physical and mental circumstances." There are no specific factual allegations that the substance of the communications equates to extreme and

outrageous conduct . Thus, the Court will grant Defendant's motion for judgment on the pleadings. In light of that conclusion, Defendant's alternative preemption argument is moot.

IV

Accordingly, it is **ORDERED** that Defendant's motion for judgment on the pleadings [Dkt. # 31] is **GRANTED**. Count II of Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

        s/Thomas L. Ludington
        THOMAS L. LUDINGTON
        United States District Judge

Dated: May 13, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 13, 2008

        s/Tracy A. Jacobs
        TRACY A. JACOBS